UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK ) <br> 1301 9th Street, N.W. ) <br> Washington, D.C.  20001, ) <br> ) <br> Plaintiff, ) <br> ) <br> V. ) <br> ) <br> FEDERAL INSURANCE COMPANY, ) <br> 15 Mountain View Road ) <br> Warren, NJ   07059, ) <br> ) <br> Please Serve: ) <br> ) <br> CT Corp. Systems ) <br> 1015 15th Street, NW ) <br> Suite 1000 ) <br> Washington, D.C. ) <br> ) <br> Defendant. ) <br> _____) | C.A. No. _____ <br> <br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Independence Federal Savings Bank, by and through its undersigned counsel, hereby brings this action against Defendant Federal Insurance Company and states as follows:

## JURISDICTION

1. This Court has diversity jurisdiction pursuant to 28 U.S.C. Section 1332(a) in that the Plaintiff and Defendant have diverse citizenship and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000).

2. Venue in this district is proper under 28 U.S.C. §1391(a).

## PARTIES

3.     Independence Federal Savings Bank (the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  The Bank operates two branches in the District of Columbia and two branches in Maryland.  Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of the Office of Thrift Supervision.

4.     Defendant Federal Insurance Company ("Federal") is organized under the laws of Indiana and has its principal office in Warren, New Jersey.  It is licensed by the District of Columbia Department of Insurance, Securities and Banking as a producer of insurance.  Federal is part of the Chubb Group of Insurance Companies.  Federal issued Forefront Security by Chubb Community Bank Bond Number 81940214 to the Bank on or about November 1, 1002 (the "Bond").

## FACTUAL BACKGROUND

### *The Teacher's Union Embezzlement*

5.     As alleged in certain litigation which is described further below, beginning in or about 1995, a scheme (the "Embezzlement Scheme") was carried out in which in excess of five million was alleged to have been embezzled from the Washington Teachers' Union, Local #6, AFL-CIO ("WTU"), the local Washington, D.C. affiliate of the American Federation of Teachers, AFL-CIO

2

("AFT").  The scheme was perpetrated by certain officers, agents, employees and representatives of the WTU ("Embezzlement Defendants").

6.  The Embezzlement Scheme involved unauthorized credit card purchases by the Embezzlement Defendants as well as the issuance of unauthorized and forged checks written by the Embezzlement Defendants on WTU's checking account at the Bank. Those checks were allegedly written for the personal use and benefit of the Embezzlement Defendants and not for the personal use and benefit of the WTU.

### The Regulatory Investigation

7.  In or about early 2003, the Office of Thrift Supervision ("OTS"), the federal regulatory agency with supervisory powers over the Bank, instituted an investigation and review of WTU's account at the Bank.

### The Teachers' Union Litigation

8. In addition to the regulatory investigation described above, the Embezzlement Scheme spawned a spate of civil litigation in which the Bank was named as a defendant.

9.  On December 27, 2002,Nathan Saunders filed a Complaint in the United States District Court for the District of Columbia on behalf of the WTU styled as *Nathan A. Saunders II(derivatively on behalf of the Washington Teachers Union) v. Esther Hankerson, et al., Case No. 1:02CV02536 (EGS)* ("Saunders Litigation").  In

the original Complaint, Saunders named the Embezzlement Defendants as defendants.  On February 6, 2003, Saunders amended his Complaint to add the Bank as an additional defendant.  In his Amended Complaint, Saunders asserted two counts against the Bank: Count XVII alleged negligence and Count XVIII alleged aiding and abetting.

10.   On January 17, 2003, the AFT filed a Complaint in the United States District Court for the District of Columbia against the Embezzlement Defendants styled as *The American Federation of Teachers, AFL-CIO, et al. v. Barbara A. Bullock, et al., Case No. 1:03-CV-00079-EGS* (the "WTU Litigation").  In that Complaint, AFT alleged that the Embezzlement Defendants had engaged in a scheme to embezzle millions of dollars from the AFT/WTU. On February 14, 2003, AFT amended its Complaint to join the WTU as a co-Plaintiff and to name the Bank as an additional Defendant.  AFT and WTU asserted four claims against the Bank: Recredit of account for unauthorized payment of checks; aiding and abetting conversion and embezzlement; aiding and abetting fiduciary duty; and negligence.

11. On February 13, 2003, yet a third Complaint was filed in the United States District Court arising out of the Embezzlement Scheme.  That Complaint was filed by George Parker and was styled as *Parker v. American Federation of Teachers, et al., Case No. 1:03-CV-00261 (EGS)* (the "Parker Litigation").  Although the Bank

was named as a defendant in the original Parker Litigation complaint, no allegations were made against the Bank.  On March 19, 2003, Parker filed a First Amended Complaint alleging that the Bank had cashed checks inappropriately and negligently and requesting an accounting of all of WTU's funds.

12.  The WTU Litigation, the Saunders Litigation and the Parker Litigation are sometimes collectively referred to herein as the "Teachers' Union Litigation."

### *The Retention of Reed Smith* <br> *and the Notification of Potential Claims*

13. On or about January 21, 2003, the Bank retained the law firm of Reed Smith LLP ("Reed Smith") as its counsel in connection with an investigation of the Washington Teachers Union and any related matters.  The Bank retained Reed Smith at its regular hourly rates.

14.  In or about January or February 2003 the Bank notified the Chubb Group (which includes Federal) of the potential claims against the Bank arising from the Embezzlement Scheme. In February 2003, the Bank advised the Chubb Group/Federal that it had retained Reed Smith to represent it with regard to any claims arising from the Embezzlement Scheme and notified the Chubb Group/Federal of its preference to continue with Reed Smith's representation.

15.  Of the four counts in the WTU Litigation asserted against the Bank, Federal determined that three (re-crediting of

the bank account, aiding and abetting, and negligence) would result in a covered loss, but that the remaining count, asserting breach of fiduciary duty, would not.  In the Saunders Litigation, although the Bank was a named defendant in only two counts, Federal determined that although the Bank might also be implicated in two additional counts, those counts were not covered by the Bond.  Based on these determinations, Federal advised the Bank, by letter dated March 27, 2003 to Donna Shuler (the Bank's then President and CEO), that Federal would reimburse the Bank for the defense of three of the four counts in the WTU Litigation, and two of the four counts in the Saunders Litigation.  Federal determined that no claims in the Parker Litigation would result in a covered loss and therefore did not agree to reimburse fees incurred in defending the Parker Litigation.

16.   Section 5 under General Agreements of the Bond provides for coverage of courts costs and attorneys fees.

17. By letter dated May 15, 2003, Federal acknowledged that the Bank had retained Reed Smith to defend it.  The May 15, 2003 letter does not state any objection to that retention.

### *Federal Unilaterally Imposes Parameters on Scope of Coverage and Reimbursement*

18.   The May 15, 2003 letter also states that only certain of the allegations which were made against the Bank in the Teachers' Union Litigation were covered under the Bond.  This

determination applied to the legal basis of the counts/claims in the Complaints filed in the Teachers' Union Litigation, as well as to specific checks involved.  In the WTU Litigation, Federal agreed to cover defense costs related to defending the claim seeking a re-crediting of WTU's account at the Bank and claims alleging negligence and aiding and abetting, but not claims alleging breaches of fiduciary duty.  In the Saunders Litigation, Federal agreed to cover defense costs related to negligence and aiding and abetting, but not claims alleging violations of RICO and RICO conspiracy.  The reductions in reimbursements which Federal made based on the legal theory of the claims made in the Sunders Litigation and WTU Litigation are referred to herein as "Reduction Based On Legal Theory."

19.  Federal also advised the Bank, in the May 15, 2003 letter, that after applying the percentage Reduction Based on Legal Theory (a fifty percent reduction in the Saunders Litigation and a twenty-five percent reduction in the WTU Litigation), it would apply to the remaining amount a further reduction and reimburse only 61% of the remaining amount of fees for the WTU Litigation, and reimburse only 18% of the remaining amount of fees for the Saunders Litigation ("Reduction Based on Individual Checks").  Federal arrived at these percentages by comparing the dollar amount of checks that had been forged or altered to the dollar amount in the prayer for relief in the WTU

Litigation ($1,450,000) and in the Saunders Litigation ($5,000,000).

20. Federal also advised the Bank in the May 15, 2003 letter that it would not reimburse any fees incurred by the Bank in defending the Parker Litigation ("Reduction Based on Parker Litigation").

21. Scott Bolden, a partner with Reed Smith, and Patricia Duffy, an Assistant Vice President of Chubb & Son, a division of Federal, had on-going discussions during 2003 and 2004 regarding the scope of Federal's coverage of the claims in the Teachers' Union Litigation and the parameters of Federal's reimbursement of the Bank's defense costs including legal fees. By May 7, 2004, Ms. Duffy, on behalf of Chubb/Federal, had agreed to reimburse 18% of 100% of the legal fees incurred in the Saunders Litigation (thus ostensibly eliminating the Reduction Based on Legal Theory, but not eliminating the Reduction Based on Individual Checks as it applied to the Saunders Litigation). As to the WTU Litigation, Federal would not agree to eliminate either the Reduction Based on Legal Theory or the Reduction Based on Individual Checks, still agreeing to reimburse only 61% of 75% of the legal fees, as reflected in a letter dated May 7, 2004 from Ms. Duffy to Mr. Bolden. Furthermore, as also stated in the May 7, 2004 Duffy letter, Chubb/Federal agreed to reimburse Reed Smith's attorneys fees at a reduced blended hourly rate of $225.00 for all lawyers (partners and associates) and $100.00 for all paralegals.

Finally, the May 7, 2004 letter also stated that invoices for fees and costs would be reviewed "for compliance with [Chubb/Federal's] litigation management guidelines" which were enclosed with the May 7, 2004 letter  ("Reductions Based on Reimbursement Guidelines").  The Reimbursement Guidelines set forth a number of deductions made to invoiced fees and costs, such as deductions for more than one attorney billing to the same task; deductions for attorney conferences; deductions for computerized legal research; and deductions in photocopying costs.

22.   By December 2006, as a result of the Reductions Based on Legal Theory, Reductions Based on Individual Checks, Reductions Based on Parker Litigation, Reductions Based on Reimbursement Guidelines, reductions in Reed Smith's standard hourly rates, and failure to reimburse for investigatory costs and fees, Federal had reimbursed the Bank only approximately $270,000 and had failed to reimburse the Bank an additional $890,000.00 the Bank had incurred in attorneys fees and costs.

23.   After December 2006, Ms. Duffy's review of, and correspondence with Reed Smith regarding, the covered claims/reimbursable fees continued.  In an April 25, 2007 letter from Ms. Duffy to Matthew Schlesinger of Reed Smith, Ms. Duffy states: "I did some research and do agree that Federal owes for the defense of *all counts* in the Saunders [Litigation] and Bullock [WTU] [L]itigation.  Federal will also agree to

reimbursement of the fees associated with the investigation of the matter . . .." (Emphasis added). Thus, Federal apparently agreed to eliminate the Reduction Based on Legal Theory for the WTU Litigation (and the Saunders Litigation, although it had already previously ostensibly agreed to do so). Federal also agreed that it would reimburse 61% of the fees incurred in connection with the investigation of the claims in the Saunders Litigation and WTU Litigation, but not fees incurred in connection with the regulatory investigation.

### *Dismissal and Consolidation of Claims*

24. By order dated September 21, 2005 in the Parker Litigation, the Court granted the plaintiffs' unopposed motion to dismiss the Parker Litigation so that the claims could be pursued in the WTU Litigation.

25. By Final Judgment dated November 21, 2005, the Saunders Litigation was dismissed with prejudice. The Final Judgment of dismissal, however, was pursuant to a resolution reached by the parties and the Final Judgment expressly provided that the claims raised in the Saunders Litigation could be pursued in the WTU Litigation.

26. As a result of dismissals of the Saunders Litigation and the Parker Litigation, by November 21, 2005, only the WTU Litigation remained pending.

*Substitution of Counsel*

27.   On or about October 5, 2007, Reed Smith withdrew its appearance as counsel for the Bank in the Teachers' Union Litigation and Cooter, Mangold, Tompert & Karas, LLP (n/k/a Cooter, Mangold, Deckelbaum & Karas, LLP)("CMDK") entered its appearance as substitute counsel on the Bank's behalf.

28.   By the time Reed Smith had withdrawn as the Bank's counsel, it had rendered on the Bank's behalf a substantial amount of services, over a period of approximately 4½ years, in the three federal lawsuits comprising the Teachers' Union Litigation, as well as services rendered in connection with the regulatory investigation.   Reed Smith's services included investigation into the claims against the Bank arising from the Embezzlement Scheme, drafting and filing responsive pleadings, full discovery (including not only paper discovery but numerous depositions as well), a significant motions practice, and oral arguments. The motions practice included Reed Smith's filing in the WTU Litigation of a motion for summary judgment on a variety of grounds.

29.   At the time CMDK was substituted in as counsel for the Bank, the Court had already denied (on September 29, 2007) the Bank's summary judgment motion (although the Court had not yet issued its opinion in support of its summary judgment rulings) having concluded that there were material facts in dispute and it appeared the case would be tried.   CMDK, upon its retention,

began to review the boxes of documents (including several years worth of pleadings files in the Teachers' Union Litigation) provided by Reed Smith, in preparing to ready itself for the pretrial.

30.  On March 17, 2008, the Court issued its opinion supporting its summary judgment orders ("Summary Judgment Opinion").  Upon review of the Summary Judgment Opinion, CMDK determined that, based on a then-recent D.C. Court of Appeals opinion, it should move, on the Bank's behalf, for reconsideration of the Court's summary judgment ruling ("Reconsideration Motion").  After the initial round of briefs supporting and opposing the Reconsideration Motion were filed and after oral argument, the Court requested additional briefing. On March 31, 2009, the Court granted the Bank's Reconsideration Motion, granted the Bank's earlier filed Motion for Summary Judgment, and dismissed the Bank from the WTU Litigation with prejudice.

31.  The WTU Litigation plaintiffs noticed an appeal to the U.S. Court of Appeals for the District of Columbia Circuit of the District Court's order granting the Bank's Reconsideration Motion ("WTU's Appeal").  After preliminary filings in connection with WTU's Appeal, the WTU Litigations plaintiffs and the Bank reached a settlement and in November 2009, WTU's appeal was dismissed with prejudice.

32.   For its services, CMDK submitted monthly invoices to the Bank which the Bank paid.   The Bank then submitted requests for reimbursement to Federal.   While Federal did reimburse some of the fees and costs paid to CMDK by the Bank, it did not reimburse one hundred percent.   Although Federal did not apply Reductions Based on Legal Theory, Reductions Based on Individual Checks, or Reductions Based on Parker Litigation (the Parker Litigation having been dismissed) to reduce its reimbursement of legal fees itemized in the CMDK invoices, it did reduce its reimbursement of fees and costs by reducing CMDK's standard hourly rates to a $300.00 blended hourly rate, by reducing to 61% its reimbursement of CMDK's costs, and by Reductions Based on Reimbursement Guidelines.

## COUNT I
### (BREACH OF CONTRACT)

33.   Plaintiff incorporates herein by reference paragraphs 1-32 as if fully set forth herein.

34.   The Bond constitutes a valid and binding contract between Federal and the Bank.

35.   By Section 5 of the General Agreements provisions in the Bond, Federal agreed to "indemnify [the Bank] for court costs and reasonable attorneys fees incurred and paid by the [Bank] in defense . . . of any claim, suit or legal proceeding with respect to which the [Bank] would be entitled to recovery under this Bond" (the "Attorneys Fees Provision").

36.   Section 4 of the Insuring Clauses insures losses resulting from "Forgery on, or fraudulent alteration of, any Negotiable Instrument . . .."  Section 5 of the Insuring Clauses insures losses resulting from "Extended Forgery."   Section 10 of the Insuring Clauses insures losses resulting from the Bank "having accepted, paid or cashed any check or Withdrawal Order made or drawn upon or against the account of the [Bank's] customer . . .."  None of the foregoing Sections 4, 5 or 10 impose a limitation or condition on the insured loss according to legal theory.  None of the foregoing Sections 4, 5 or 10 impose a limitation or condition on the insured loss according to a percentage of forged or unauthorized checks measured against the *ad damnum* clause of an underlying complaint.

37.   The Embezzlement Scheme caused the Bank to have to incur substantial legal fees and costs to investigate and defend itself in the Teachers Union Litigation and to cooperate in the regulatory investigation.  Those fees and costs, beginning with the regulatory investigation and continuing through the dismissal of the WTU Litigation appellate proceedings in November 2009, were reasonable and Federal was obligated under its contract of insurance (the Bond) to reimburse those fees and costs to the Bank.

38. Reed Smith and CMDK charged the Bank approximately $1,354,000 in fees and costs.  Federal, however, reimbursed only a small percentage of those fees and costs, having made

significant reductions, including but not limited to: Reductions Based on Legal Theory, Reductions Based on Individual Checks, Reductions Based on Parker Litigation, Reductions Based on Reimbursement Guidelines, reductions in the hourly rate of the attorneys and paralegals and refusal to reimburse fees and costs incurred in connection with the regulatory investigation.  The Attorneys Fees Provision of the Bond does not provide for, nor did the Bank agree to, any of the foregoing reductions.

39.   Federal materially breached the Bond when it failed and refused to reimburse all of the Bank's reasonable attorneys fees and costs and made the significant reductions as described above in Paragraph 38.

40. Federal's material breach of the Bond proximately caused the Bank to suffer monetary damages.

WHEREFORE, Plaintiff demands judgment against Defendant Federal Insurance Company in an amount in excess of Nine Hundred Thousand Dollars ($900,000.00) plus interest, attorneys fees and costs, and for such other further relief the Court deems necessary or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues herein.

Respectfully submitted,

COOTER, MANGOLD, DECKELBAUM
& KARAS, L.L.P.

Dale A. Cooter, Bar No.227454
Donna S. Mangold, Bar No. 358851
5301 Wisconsin Ave., N.W.
Suite 500
Washington, D.C. 20015
Tel.(202)537-0700
Fax (202)364-3664
efiling@cootermangold.com
*Attorneys for Plaintiff*
*Independence Federal Savings Bank*